Eastern District of Kentucky
FILED

MAR 2 5 2005

AT COVINGTON
LESLIE G WHITMER
CLERK U.S DISTRICT COURT

# UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTICT OF KENTUCKY

WAYNE CARLISLE   :
66 Rio Vista Drive   :
Ft. Thomas, Kentucky  41075   :
  :
WJG STRATEGIC   :
INVESTMENTS, LLC   :
Post Office Box 72160   :
Newport, Kentucky  41072   :
  :
  :
WC THOMAS, LLC   :
Post Office Box 72160   :
Newport, Kentucky  41072   :
  :
  :
WC VENTURE CORP.   :
Post Office Box 72160   :
Newport, Kentucky  41072   :
  :
  :
OHIO 1999 IRREVOCABLE   :
ESBT OF WAYNE CARLISLE   :
3040 Forrer Street   :
Cincinnati, Ohio  45209   :
  :
JAMES E. BUSHMAN   :
Post Office Box 72160   :
Newport, Kentucky  41072   :
  :
JB CINOH, LLC   :
Post Office Box 72160   :
Newport, Kentucky  41072   :
  :
JEB VENTURE CORP.   :
Post Office Box 72160   :
Newport, Kentucky  41072   :
  :
JEB REVOCABLE ESBT,   :
WAYNE CARLISLE, TRUSTEE   :
3040 Forrer Street   :
Cincinnati, Ohio  45209   :
  :
GARY L. STRASSEL   :
Post Office Box 72160   :
Newport, Kentucky  41072   :
  :
**and**   :
  :

Case No. 05-59 -DLB
(Judge _____)
(Magistrate _____)

GS NOKY, LLC                                    :
Post Office Box 72160                           :
Newport, Kentucky  41072                        :
                                                :
                    Plaintiffs,                 :
                                                :
          v.                                    :
                                                :
CURTIS, MALLET-PREVOST,                         :
COLT & MOSLE, LLP                               :
101 Park Avenue, 35th Floor                     :
New York, New York  10178                       :
                                                :
WILLIAM L. BRICKER, JR.                         :
c/o Curtis, Mallet-Prevost,                     :
Colt & Mosle, LLP                               :
101 Park Avenue,  35th Floor                    :
New York, New York  10178                       :
                                                :
BRICOLAGE CAPITAL, LLC                          :
10 East 50th Street, 22nd Floor                 :
New York, New York  10022                       :
                                                :
ANDREW D. BEER                                  :
c/o Bricolage Capital, LLC                      :
10 East 50th Street, 22nd Floor                 :
New York, New York  10022                       :
                                                :
SAMYAK C. VEERA                                 :
c/o Bricolage Capital, LLC                      :
10 East 50th Street, 22nd Floor                 :
New York, New York  10022                       :
                                                :
ARTHUR ANDERSEN LLP                             :
33 West Monroe Street                           :
Chicago, Illinois  60603                        :
                                                :
INTEGRATED CAPITAL                              :
ASSOCIATES, INC.                                :
220 Jackson Street, Suite 2200                  :
San Francisco, California  94111                :
                                                :
INTERCONTINENTAL                                :
PACIFIC GROUP, INC.                             :
220 Jackson Street, Suite 2200                  :
San Francisco, California  94111                :
                                                :
                    and                         :
                                                :

2

**PRISM CONNECTIVITY**          :
**VENTURES, LLC**               :
**c/o Nationwide Information Services,**   :
**Inc., Registered Agent**      :
**15 E. North Street**          :
**Dover, Delaware  19901**      :
                                :
          **Defendants.**          :

## COMPLAINT

Now come plaintiffs, Wayne Carlisle, WJG Strategic Investments, LLC, WC Thomas, LLC, WC Venture Corp., the Ohio 1999 Irrevocable Trust of Wayne Carlisle, James E. Bushman, JB Cinoh, LLC, JEB Venture Corp., the JEB Revocable ESBT, Wayne Carlisle, Trustee, Gary L. Strassel and GS Noky, LLC [collectively "Plaintiffs"], and for their complaint against defendants, Curtis, Mallet-Prevost, Colt & Mosle, LLP, William L. Bricker, Jr., Bricolage Capital, LLC, Andrew D. Beer, Samyak C. Veera, Arthur Andersen, LLC, Integrated Capital Associates, Inc., Intercontinental Pacific Group, Inc. and Prism Connectivity Ventures, LLC [collectively "Defendants"], state as follows.

## I.

## INTRODUCTION

1.      The Plaintiffs were induced by a group of conflicted professionals with hidden business relationships and interests to buy a consolidated investment package designed to provide tax and other financial benefits.  The tax savings elements, including legal advice, written opinions, tax planning advice and securities trading activities, were designed and promoted by the Defendants who knew, or should have known, that the strategy was a series of sham transactions that had no hope of passing review by the Internal Revenue Service.

2.      Some of these Defendants issued legal advice and written opinions that were reckless and not independently arrived at.  As the Plaintiffs would discover, the advice and

3

opinions could not form the basis for any tax position taken by them, or produce the tax benefits they thought they would be able to claim.

      3.      In addition, as an integral part and condition of the investment package, Plaintiffs were required, due to the conspiracy of the Defendants, to purchase high risk stock-related warrants and options that were virtually worthless.  As Plaintiffs would discover, those required purchases were nothing more than a conduit for the payment of fees and expenses to the promoters of, and other participants in, the transactions.

## II.

### JURISDICTION AND VENUE

      4.      This is an action for fraud, civil conspiracy, professional malpractice, breach of fiduciary duty, breach of contract, breach of duty of good faith and fair dealing and negligence.

      5.      This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332. Plaintiffs allege damages in excess of the jurisdictional amount, exclusive of interest and costs.

      6.      Venue is proper in this jurisdiction pursuant to 28 U.S.C. § 1391(a).  One or more of the Defendants reside, may be found, has an agent or transacts its affairs in this district.

## III.

### PARTIES

      7.      Plaintiff Wayne Carlisle is, and at all times relevant hereto was, a citizen and resident of the Commonwealth of Kentucky, who conducted business in the Commonwealth.

      8.      Plaintiff WJG Strategic Investments, LLC ["WJG Strategic Investments"] is a limited liability company organized and existing under the laws of the State of Kentucky,

with its principal place of business in Newport, Kentucky. At all times relevant hereto, WJG Strategic Investments was the Plaintiffs' investment company.

9.     Plaintiff WC Thomas, LLC was a single-member limited liability company organized and existing under the laws of the State of Ohio, with its principal place of business in Cincinnati, Ohio. At all times relevant hereto, Carlisle utilized WC Thomas, LLC to engage in Leveraged Option Strategy (as defined *infra*) transactions.

10.     Plaintiff WC Venture Corp. was a corporation organized and existing under the laws of the State of Ohio, with its principal place of business in Cincinnati, Ohio. At all times relevant hereto, Carlisle utilized WC Venture Corp. to engage in Leveraged Option Strategy transactions.

11.     Plaintiff the Ohio 1999 Irrevocable ESBT of Wayne Carlisle [the "Ohio 1999 Irrevocable ESBT"] is a trust created and existing under the laws of the State of Ohio, with its principal place of business in Cincinnati, Ohio. At all times relevant hereto, Carlisle utilized the Ohio 1999 Irrevocable Trust to engage in Leveraged Option Strategy transactions.

12.     Plaintiff James E. Bushman is, and at all times relevant hereto was, a citizen and resident of State of Ohio, who conducted business in the Commonwealth.

13.     Plaintiff JB Cinoh, LLC was a single-member limited liability company organized and existing under the laws of the State of Ohio, with its principal place of business in Cincinnati, Ohio. At all times relevant hereto, Bushman utilized JB Cinoh, LLC to engage in Leveraged Option Strategy transactions.

14.     Plaintiff JEB Venture Corp. was a corporation organized and existing under the laws of the State of Ohio, with its principal place of business in Cincinnati, Ohio. At all times relevant hereto, Bushman utilized JEB Venture Corp. to engage in Leveraged Option Strategy transactions.

15.     Plaintiff the JEB Revocable ESBT, Wayne Carlisle, Trustee [the "JEB Revocable Trust"] is a trust created and existing under the laws of the State of Ohio, with its principal place of business in Cincinnati, Ohio. At all times relevant hereto, Bushman utilized the JEB Revocable ESBT, Wayne Carlisle, Trustee to engage in Leveraged Option Strategy transactions.

16.     Plaintiff Gary L. Strassel is, and at all times relevant hereto was, a citizen and resident of the State of Ohio, who conducted business in the Commonwealth.

17.     Plaintiff GS Noky, LLC was a single-member limited liability company organized and existing under the laws of the State of Ohio, with its principal place of business in Cincinnati, Ohio. At all times relevant hereto, Strassel utilized GS Noky, LLC to engage in Leveraged Option Strategy transactions.

18.     Defendant Curtis, Mallet-Prevost, Colt & Mosle, LLP [the "Curtis Firm"] is a law firm, organized and existing as a limited liability partnership under the laws of the State of New York, with its principal place of business in New York, New York. At all times relevant hereto, the Curtis Firm transacted business in the Eastern District of Kentucky.

19.     Defendant William L. Bricker, Jr. ["Bricker"] is, and at all times relevant hereto was, a citizen and resident of the State of Connecticut, an attorney and partner of the law firm Curtis, Mallet-Prevost, Colt & Mosle, LLP.

20.     Defendant Bricolage Capital, LLC ["Bricolage "] is a limited liability corporation organized and existing under the laws of the State of New York, with its principal place of business in New York, New York. At all times relevant hereto, Bricolage transacted business in the Eastern District of Kentucky.

21.     Defendant, Andrew D. Beer ["Beer"] is, and at all times relevant hereto was, a citizen and resident of the State of Connecticut, and a principal of Bricolage Capital, LLC.

22.     Defendant, Samyak C. Veera ["Veera"] is, and at all times relevant hereto was, a citizen and resident of the State of New York, and a principal of Bricolage Capital, LLC.

23.     Defendant Arthur Andersen, LLC ["Andersen"] is an accounting firm, organized and existing as a limited liability corporation under the laws of the State of Illinois, with its principal place of business in Chicago, Illinois. At all times relevant hereto, Arthur Andersen transacted business in the Eastern District of Kentucky.

24.     Defendant Intercontinental Pacific Group, Inc. ["IPG"] is a corporation organized and existing under the laws of the State of California, with its principal place of business in San Francisco, California. IPG is an investment banking firm, with the same principals as ICA.

25.     Defendant Integrated Capital Associates, Inc. ["ICA"] is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business in San Francisco, California. ICA is an investment banking firm, with the same principals as IPG.

26.     Defendant Prism Connectivity Ventures, LLC ["Prism Connectivity"] is a limited liability corporation organized and existing under the laws of the State of Delaware, with its principal place of business in Dover, Delaware.

### IV.

### BACKGROUND FACTS

27.     Andersen, based in Chicago, Illinois, was once one of the so-called "Big Five" accounting firms in the United States. Among other things, Andersen performed accounting and consulting services for clients that operated businesses throughout the United States and the world. Andersen lost is auditing license in the United States in 2002 after it was convicted of obstructing justice for shredding documents related to the Enron

7

Corporation.  At all times relevant hereto, Andersen performed business and personal accounting services for, and provided tax advice to, Plaintiffs.

28.     In June, 1999, Plaintiffs sold their heavy construction equipment business. Prior to the sale of the business, Andersen also served as the company's accountant, auditor and tax advisor for more than twenty years.

29.     After the sale of their business, Plaintiffs began exploring methods of legally minimizing taxes on gains realized from the sale.  Plaintiffs consulted with their tax advisor and accountant Andersen, who advised them on potential tax shelters, investment options and others matters.

### Defendants' Leveraged Option Strategy and Conditions of Participation Therein

30.     In approximately September, 1999, Andersen introduced Plaintiffs to Bricolage, which held itself out as "a financial boutique that developed complex structured transactions for high net worth individuals and private corporations."  Andersen, Bricolage and the Curtis Firm designed and jointly recommended a tax shelter, a leveraged option strategy involving foreign currency exchange options [the "Leveraged Option Strategy"], to Plaintiffs.

31.     The Leveraged Option Strategy used a series of steps, involving interests in partnerships, to generate tax losses to offset income from other transactions.  In one Leveraged Option Strategy variation:

> a taxpayer purchases and writes options and purports to create a substantial positive basis in a partnership interest by transferring those option positions to a partnership.  For example, a taxpayer might purchase call options for a cost of $1,000X and simultaneously write offsetting call options, with a slightly higher strike price but the same expiration date, for a premium of slightly less than $1,000X.  Those option positions are then transferred to a partnership which, using additional amounts contributed to the partnership, may engage in investment activities.

8

> Under the position advanced by the promoters of this
> arrangement, the taxpayer claims that the basis in the
> taxpayer's partnership interest is increased by the cost of the
> purchased call options but is not reduced under [Internal
> Revenue Code] § 752 as a result of the partnership's
> assumption of the taxpayer's obligation with respect to the
> written call options.  Therefore, disregarding additional
> amounts contributed to the partnership, transaction costs, and
> any income realized and expenses incurred at the partnership
> level, the taxpayer purports to have a basis in the partnership
> interest equal to the cost of the purchased call options
> ($1000X in this example), even though the taxpayer's net
> economic outlay to acquire the partnership interest and the
> value of the partnership interest are nominal or zero.  On the
> disposition of the partnership interest, the taxpayer claims a
> tax loss ($1,000X in this example), even though the taxpayer
> has incurred no corresponding economic loss.

32.     Andersen, Bricolage and the Curtis Firm informed Plaintiffs that, as a

condition of participating in the Leveraged Option Strategy transaction, they were required to

invest in certain warrants to purchase stock of other small, high-tech companies.  They

further informed Plaintiffs that the non-negotiable price for the warrants would be

$4,350,000, but did not even initially identify the specific companies in which Plaintiffs

would be purchasing warrants.

### The Curtis Firm's Lack of Independence

33.     In the course of presenting and advocating the Leveraged Option Strategy,

Andersen and Bricolage recommended the Curtis Firm to Plaintiffs.  Bricolage represented to

Plaintiffs that the Curtis Firm could provide an independent, reliable legal opinion to

substantiate the legality and validity of the Leveraged Option Strategy tax shelter.

34.     The Curtis Firm is an international law firm headquartered in New York, with

branch offices in the United States, Mexico, Europe and the Middle East.  Founded in 1830,

Curtis claims expertise in the "core practices of International Corporate Law and Litigation

. . . complemented by numerous specialty areas, including Admiralty, Banking & Regulatory, Bankruptcy & Creditors' Rights, Environmental, Immigration, Intellectual Property, Real Estate, Tax and Trusts & Estates."

35.     The Curtis Firm held itself out, in this matter, to be independent legal counsel that would provide Plaintiffs independent "advice and assistant regarding investments in currency options, including rendering of an opinion regarding certain tax consequences of such investments." Specifically, the Curtis Firm was to issue independent and reliable tax opinion letters to Plaintiffs opining that the Leveraged Option Strategy was properly allowable for federal income tax purposes. Unbeknownst to Plaintiffs, however, the Curtis Firm was not independent.

36.     In fact, the Curtis Firm was a co-promoter of the Leveraged Option Strategy, which role it failed to disclose to Plaintiffs.

37.     Plaintiffs did not know that the Curtis Firm was the co-promoter of the Leveraged Option Strategy, and therefore deemed by the IRS as not independent. As a non-independent legal counsel, the Curtis Firm's opinion by IRS regulations and policies could not be relied upon by a taxpayer. Each Plaintiff individually signed a retainer agreement with the Curtis Firm and was subsequently billed $100,000 as a retainer for professional services to be rendered. Under the terms of their retention agreements, the Curtis Firm was to bill each Plaintiff:

> for [their] professional services at [their] customary hourly rates for paraprofessionals and professionals and for reimbursement of any and all disbursements that [they] . . . advanced on [Plaintiff's] behalf. Such billing [was to] occur in accordance with the [Curtis] Firm's customary billing practices, which generally require[d] monthly billings and require[d] payment of all fee statements within thirty (30) days after they [were] rendered.

10

Plaintiffs, however, never received another bill from the Curtis Firm. Instead, they were directed by Defendants to take other steps for payment.

**ICA Bankrolls the
Curtis Firm's Tax Shelter Business**

38.     Rather than accepting payment of $100,000 from each Plaintiff, the Curtis Firm required Plaintiffs to issue individual checks, made payable to IPG, to reimburse ICA for their individual $100,000 retainers that ICA paid. ICA and IPG, the president of both of which is Douglas Wolf, are represented by the Curtis Firm. However, the Curtis Firm never disclosed that business relationship to Plaintiffs.

39.     Nor were Plaintiffs ever told that, at the same time that ICA paid the Curtis Firm for the tax shelter-related services to be performed on their behalf, ICA also paid the Curtis Firm for tax shelter-related services to be performed for at least five other ICA-related clients. In short, upon information and belief, ICA was financing the Curtis Firm's tax shelter business in order to ensure access to, and a steady stream of income from, wealthy individuals who they engaged in Bricolage's Leveraged Option Strategy and purchased the required warrants that ICA owned.

**Plaintiffs Implement the Leveraged Option Strategy
and Fulfill Their Obligation to Purchase Warrants**

40.     On the basis of the representations made by Andersen, Bricolage and the Curtis Firm, Plaintiffs each engaged, through their separate business entities, in Leveraged Option Strategy transactions.

41.     After their Leveraged Option Strategy transactions were complete, in November, 1999, Plaintiffs formed the entity WJG Strategic Investments and, as instructed by Andersen and Bricolage, funded it with the $4,350,000 necessary to pay for the warrants in still-unidentified companies.

11

42.     Thereafter, in November, 1999, Andersen provided Plaintiffs with information pertaining to TelEvoke, Inc. ["TelEvoke"], one of the companies in which Plaintiffs were required to purchase warrants.

43.     On or about November 30, 1999, Plaintiffs, through WJG Strategic Investments, purchased the required warrant for 8% of the common stock in TelEvoke for $3,000,000 from Prism Connectivity. Only afterwards, however, did they learn that two months prior, on October 1, 1999, that warrant was owned by ICA, a company related to Prism Connectivity.

44.     In December, 1999, Andersen provided Plaintiffs with information pertaining to eCryption Technologies, Inc. ["eCryption"], the second company in which Plaintiffs were required to purchase warrants.

45.     On or about January 3, 2000, Plaintiffs, through WJG Strategic Investments, purchased the required warrant for 38.58% of the common stock in eCryption for $1,350,000 from Prism Connectivity. Only afterwards, however, did they learn that one month prior, on December 1, 1999, that warrant was owned by ICA.

46.     Plaintiffs' warrants in both TelEvoke and eCryption were virtually worthless.

### The Scheme

47.     Upon information and belief, Andersen, Beer, Bricolage, Bricker, the Curtis Firm, ICA, IPG, Prism Connectivity and/or Veera had entered into an undisclosed promotion arrangement whereby each would receive a portion of the legal and other fees and costs associated with the Leveraged Option Strategy, as well as a portion of the purchase prices of the warrants, paid by Plaintiffs to Andersen, Bricolage, the Curtis Firm, ICA, IPG and/or Prism Connectivity.

**The Curtis Firm's Opinion Letters**
**Lacked Independence and Were Worthless**

48.     Meanwhile, on or about June 26, 2000 – without ever having met or even

interviewed Plaintiffs – the Curtis Firm sent Plaintiffs individual opinion letters regarding the

propriety of the Leveraged Option Strategy transaction.  Each Plaintiff received a virtually

identical opinion letter.  In the letters the Curtis Firm advised Plaintiffs, among other things,

that their entire Leveraged Option Strategy transactions were properly allowable for federal

income tax purposes.

49.     Upon information and belief, the opinion letters prepared for Plaintiffs by the

Curtis Firm as to the tax benefits of the Leveraged Option Strategy transaction were prepared

well in advance of Andersen and Bricolage's solicitation of Plaintiffs as clients.  The

opinions were canned, deceptive prefabricated forms that were utilized, with minor changes

based on the particular client, for each Leveraged Option Strategy transaction promoted and

sold.

50.     However, on December 10, 1999, shortly before Plaintiff retained the Curtis

Firm, the IRS issued IRS Notice 1999-59, entitled "Tax Avoidance Using Distribution of

Encumbered Property."  In that notice, the IRS stated that:

> [t]he Internal Revenue Service and Treasury Department have
> become aware of certain types of transactions, as described
> below, that are being marketed to taxpayers for the purposes
> of generating tax losses.  This notice is being issued to alert
> taxpayers and their representatives that the purported losses
> arising from such transactions are not property allowable for
> Federal income tax purposes. . . . Through a contrived series
> of steps, taxpayers claimed tax losses for capital outlays that
> they have in fact recovered.  Such artificial losses are not
> allowable for Federal income tax purposes.

Thus, the clear message from the IRS was that purported losses arising from transactions

wholly lacking in "economic substance" (*i.e.*, Leveraged Option Strategy) are not properly

allowable for Federal income tax purposes. Yet Andersen and the Curtis Firm diminished the importance of the notice, in order to keep their tax shelter business alive.

51.     As a result of IRS Notice 1999-59, Andersen and the Curtis Firm knew or should have known that the IRS would assert that the purported losses arising from the Leveraged Option Strategy were improper and not allowable for tax purposes. At no time prior or subsequent to their implementation of the Leveraged Option Strategy, however, were Plaintiffs informed, by Andersen , Bricolage and/or the Curtis Firm, that the IRS contended that such transaction constituted an abusive tax shelter within the meaning of Code Section 6111.

52.     Thereafter, on August 11, 2000, the IRS published Notice 2000-44, entitled "Tax Avoidance Using Artificially High Basis." The notice concerned "similar transactions [to those described in IRS Notice 1999-59] that purport to generate tax losses for taxpayers," thus indicating that the IRS believed it had addressed Leveraged Option Strategy-like transactions in that prior notice. More importantly, Notice 2000-44 described the precise transaction marketed by Andersen, Bricolage and the Curtis Firm to Plaintiffs as the Leveraged Option Strategy. The IRS stated that "[t]he purported losses from these transactions (and from any similar arrangements designed to produce non-economic tax losses by artificially overstating basis in partnership interest) are not allowable as deductions for federal income tax purposes." In short, the clear message from the IRS to Andersen, Bricolage and the Curtis Firm was that the purported losses arising from the Leveraged Option Strategy are not properly allowable for federal income tax purpose. However, despite a specific inquiry by Plaintiffs regarding the potential consequences of Notice 2000-44, Andersen and the Curtis Firm again downplayed the notice to the detriment of Plaintiffs, informing them that "Notice 2000-44 more likely than not [did] not impact any of the conclusions reached in the the[ir] Opinions."

14

53.     Andersen, Bricolage and the Curtis Firm knew or should have known, as the result of IRS Notice 2000-44 issued on August 11, 2000, if not earlier, that the purported losses arising from Plaintiffs' Leveraged Option Strategy transactions were not properly allowable for federal or state income tax purposes.  Yet Andersen, Bricolage and the Curtis Firm  failed to retract, modify or qualify, in any way, their advice and opinions expressed to Plaintiffs confirming the propriety of Leveraged Option Strategy.

### Plaintiffs' 1999 Tax Returns,
### Audit and Amnesty

54.     Subsequently, Andersen prepared, purportedly in accordance with professional standards, and signed Plaintiffs' 1999 tax returns.  During the course of such preparation, despite the import of IRS Notices 1999-59 and 2000-44, Andersen advised Plaintiffs that their Leveraged Option Strategy transactions were legal tax shelters, and that they could properly claim capital and ordinary losses from the Leveraged Option Strategy transactions on their tax returns for 1999.  Andersen, therefore, utilized the capital and ordinary losses generated by the Leveraged Option Strategy transactions in Plaintiffs' returns.  And, in reasonable reliance on the tax and legal advice rendered by Andersen and the Curtis Firm, Plaintiffs signed and timely filed their 1999 income tax returns by the applicable due dates (including all extensions).

55.     A year and a half later, on March 7, 2002, the Curtis Firm circulated a memorandum to "Our Clients," including Plaintiffs, regarding IRS Announcement 2002-2, which announced a disclosure initiative whereby the federal government was offering amnesty to taxpayers who engaged in the Leveraged Option Strategy and other similar transactions [the "Amnesty Program"].  At no time, however, did the Curtis Firm recommend or advise Plaintiffs to enroll in the Amnesty Program.  Nor did it disclose any of the weaknesses in its opinions, or the effect that their lack of independence had on their clients.

56.     Subsequently, after seeking independent, comprehensive reviews of their entire Leveraged Option Strategy transactions, Plaintiffs each enrolled in the IRS's Announcement 2004-46 Settlement Initiative.

57.     On March 1, 2005, the IRS approved a closing agreement with Carlisle and the Ohio 1999 Irrevocable ESBT, pursuant to which all outstanding issues with the federal tax authorities were resolved.  Pursuant to those agreements, they paid all taxes, penalties and interest due to federal tax authorities.  Subsequently, they filed amended state tax returns and paid all taxes and interest due.

58.     Bushman and the JEB Revocable ESBT, likewise, resolved all outstanding issues with federal tax authorities when the IRS approved their closing agreements on October 18, 2004.  Pursuant to those agreements they  paid all taxes, penalties and interest due to federal tax authorities.  Subsequently, they filed amended state tax returns and paid all taxes and interest due.

59.     On October 18, 2004 the IRS also approved a closing agreement with Strassel, pursuant to which all outstanding issues with the federal tax authorities were resolved.  Pursuant to that agreement he paid all taxes, penalties and interest due to federal tax authorities.  Subsequently, he filed amended state tax returns and paid all taxes and interest due.

### Plaintiffs' Damages

60.     As the result of having engaged in the Leveraged Option Strategy transactions, and having had to purchase the TelEvoke and eCryption warrants, Plaintiffs have lost millions of dollars and did not take advantage of other legitimate tax savings opportunities.

61.     In conjunction with the Leveraged Option Strategy transactions, Carlisle paid fees to Bricolage either individually and/or through his business entities.  Carlisle also paid

the Curtis Firm for its worthless opinion letter, interest and penalties assessed by federal tax authorities, and interest assessed by state tax authorities. He has additionally paid, and will continue to pay, attorneys, tax attorneys and accountants an as yet undetermined, but significant, amount of fees in connection with rectifying the wrong that have been perpetrated against him.

62.    In conjunction with the Leveraged Option Strategy transactions, Bushman also paid fees to Bricolage either individually and/or through his business entities. He also paid the Curtis Firm for its worthless opinion letter, interest and penalties assessed by federal tax authorities, and interest assessed by state tax authorities. He has additionally paid, and will continue to pay, attorneys, tax attorneys and accountants an as yet undetermined, but significant, amount of fees in connection with rectifying the wrong that have been perpetrated against him.

63.    In conjunction with the Leveraged Option Strategy transactions, Strassel paid fees to Bricolage either individually and/or through his business entities. Strassel also paid the Curtis Firm for its worthless opinion letter, interest and penalties assessed by federal tax authorities. He has additionally paid, and will continue to pay, attorneys, tax attorneys and accountants an as yet undetermined, but significant, amount of fees in connection with rectifying the wrong that have been perpetrated against him.

64.    Plaintiffs also, collectively, paid ICA, IPG and/or Prism Connectivity $3,000,000 for the worthless warrant to purchase stock in TelEvoke, and $1,350,000 for the worthless warrant to purchase stock in eCryption.

## IV.

## <u>CAUSES OF ACTION</u>

### <u>COUNT ONE – FRAUD</u>
### <u>(AGAINST ALL DEFENDANTS)</u>

65.     Plaintiffs incorporate by reference the foregoing paragraphs of the Complaint as if fully set forth herein and further allege as follows.

66.     In order to induce Plaintiffs to enter into Leveraged Option Strategy transactions, pay them millions of dollars in fees, and purchase worthless warrants to purchase stock, Defendants knowingly made numerous affirmative misrepresentations to, and intentionally withheld material facts from Plaintiffs including, but not limited to, that:

- each of the transactions in which Plaintiffs engaged as part of the Leveraged Option Strategy was meaningful and imbued with non-tax considerations;

- their entire Leveraged Option Strategy transactions were properly allowable for federal income tax purposes;

- Defendants were engaged in an undisclosed, material business enterprise and conspired to create an "all or nothing" investment package that was worthless;

- the Curtis Firm had material, conflicting business relationships with Andersen, Bricolage, ICA and/or IPG, which so compromised its independence that it was rendered incapable of giving independent, unbiased opinion to which Plaintiffs were entitled;

- as a co-promoter of the Leveraged Option Strategy, the IRS would deem the Curtis Firm non-independent, thereby precluding Plaintiffs from relying upon it for independent tax advice;

- the "independent" opinion letter issued by the Curtis Firm was a canned, deceptive prefabricated form that was utilized, with minor changes based on the particular client, for each and every Leveraged Option Strategy transaction sold; and

- the owner of the warrants to purchase stock in TelEvoke and eCryption was a client of the Curtis Firm.

67.     Such affirmative misrepresentations and intentional omissions of material facts were made knowingly by Defendants with the intent to induce Plaintiffs to enter into Leveraged Option Strategy transactions, pay them millions of dollars in fees, and purchase worthless warrants to purchase stock,

68.     In reasonable reliance on Defendant's affirmative misrepresentations and intentional omissions of material facts, Plaintiffs paid Defendants millions of dollars in fees, paid to execute the Leveraged Option Strategy transactions, purchased unnecessary investments to effectuate the Leveraged Option Strategy transactions, purchased worthless warrants to purchase stock, did not avail themselves of legitimate tax savings opportunities, and filed federal and state tax returns that reflected improper deductions for capital losses resulting from the Leveraged Option Strategy transactions.

69.     But for Defendants' affirmative misrepresentations and intentional omissions of material facts, Plaintiffs would not have hired Defendants for advice on the Leveraged Option Strategy strategy, engaged in the Leveraged Option Strategy transactions, purchased worthless warrants to purchase stock, claimed the purportedly resulting capital losses on their income tax returns, signed and filed their tax returns as prepared by Defendants in reliance on Defendants' advice, and/or failed to avail themselves of legitimate tax savings opportunities.

70.     As a result of Defendants' conduct, Plaintiffs have suffered injury in the nature of fees paid to Defendants, interest, penalties, the purchase price of the worthless warrants to purchase stock, and additional professional fees to rectifying the wrongs perpetrated against them.

71.     By reason of such acts and conduct, Plaintiffs are entitled to recover all actual damages sustained as a result of these Defendants' acts as alleged, to be proven at trial, plus

19

punitive damages in accordance with the evidence, interest, costs and reasonable attorneys fees.

## COUNT TWO – CIVIL CONSPIRACY
## (AGAINST ALL DEFENDANTS)

72.     Plaintiffs incorporate by reference the foregoing paragraphs of the Complaint as if fully set forth herein and further allege as follows.

73.     As described more fully above, Defendants knowingly acted in concert to market and implement the fraudulent and illegal business package, including the Leveraged Option Strategy and sale of warrants to purchase stock.  In doing so, Defendants acted with full  knowledge and awareness that the transaction was designed to give the false impressions that a complex series of financial transactions were legitimate business transactions that had economic substance from investment standpoint, when they in fact lacked those features.

74.     Defendants acted in their respective roles, as described above, according to a predetermined and commonly understood and accepted plan of action, all for the purposes of obtaining millions of dollars in professional and investment fees from Plaintiffs.

75.     Defendants' acts were contrary to law.

76.     There was a meeting of the minds between and among Defendants to commit the unlawful acts alleged herein.  The conspiracy to commit such unlawful, overt acts proximately caused and continues to cause Plaintiffs' damages as set forth herein.

77.     As a result of Defendants' conduct, Plaintiffs have suffered injury in the nature of fees paid to Defendants, taxes, interest, penalties, the purchase price of the worthless warrants to purchase stock, and additional professional fees to rectifying the wrongs perpetrated against them.

78.     By reason of such acts and conduct, Plaintiffs are entitled to recover all actual damages sustained as a result of these Defendants' acts as alleged, to be proven at trial, plus

punitive damages in accordance with the evidence, interest, costs and reasonable attorneys fees.

## COUNT THREE – PROFESSIONAL MALPRACTICE
## (AGAINST THE CURTIS FIRM)

79.     Plaintiffs incorporate by reference the foregoing paragraphs of the Complaint as if fully set forth herein and further allege as follows.

80.     As Plaintiffs' attorneys, the Curtis Firm owed Plaintiffs a duty to exercise the degree of care, skill and diligence commonly possessed by members of the legal community, and to comply with the applicable provisions of its code of professional responsibility.

81.     The Curtis Firm failed to meet the applicable standards of care and to abide by the applicable provisions of its code of professional responsibility by, among other things:

- engaging in professional relationships that violated its professional and ethical rules of conduct;

- taking advantage of a relationship of trust and confidence in recommending the Leveraged Option Strategy;

- promoting, implementing, advising, recommending and selling an illegal, improper and invalid tax shelter that is disallowed and/or prohibited by the IRS;

- charging and collecting unreasonable, excessive and unethical fees;

- failing to disclose the actual roles of each Defendant in the Leveraged Option Strategy transaction;

- failing to disclose that Defendants were splitting and/or sharing fees;

- failing to advise Plaintiffs that the Curtis Firm  was a co-promoter of the Leveraged Option Strategy;

- failing to fully and properly inform and advise Plaintiffs of IRS Notice 2000-44 and its implications on the Leveraged Option Strategy;

- failing to revise, alter, amend or modify the advice, recommendations, instructions representations, and opinions made to Plaintiffs, regarding the propriety of the Leveraged Option Strategy in light of IRS Notice 2000-44;

- failing to advise, recommend and instruct Plaintiffs to amend their tax returns in light of IRS Notice 2000-44 or otherwise;

- failing to recommend and advise Plaintiffs to enroll in the Amnesty Program in order to prevent penalties and interest;

- failing to comply with its ethical obligations to Plaintiffs;

- violating its professional rules of conduct; and

- providing erroneous legal advice and opinions.

82.     But for the Curtis Firm's failure meet the applicable standard of care and to abide by the applicable provisions of its code of professional responsibility, Plaintiffs would never have hired the Curtis Firm for advice on the Leveraged Option Strategy, engaged in the Leveraged Option Strategy transactions, purchased unnecessary investments to effectuate the Leveraged Option Strategy transaction, filed federal and state tax returns that reflected deductions for losses resulting from the Leveraged Option Strategy transactions, failed to file amended tax returns, failed to enroll in the Amnesty Program, and failed to avail themselves of other legitimate tax savings opportunities.

83.     As a direct and proximate cause of the Curtis Firm's professional malpractice, Plaintiffs paid millions of dollars in fees to Defendants, taxes, interest, penalties, the purchase price of the worthless warrants to purchase stock, and additional professional fees to rectifying the wrongs perpetrated against them.

84.     By reason of such acts and conduct, Plaintiffs are entitled to recover all actual damages sustained as a result of the Curtis Firm's professional malpractice as alleged, to be

proven at trial, plus punitive damages in accordance with the evidence, interest, costs and reasonable attorneys fees.

### COUNT FOUR – PROFESSIONAL MALPRACTICE
### (AGAINST ANDERSEN)

85.     Plaintiffs incorporate by reference the foregoing paragraphs of the Complaint as if fully set forth herein and further allege as follows.

86.     As Plaintiffs' tax advisors and accountants, Andersen owed Plaintiffs a duty to exercise the degree of care, skill and diligence commonly possessed by members of the accounting community, and to comply with the applicable provisions of its code of professional responsibility.

87.     Andersen failed to meet the applicable standard of care and to abide by the applicable provisions of its code of professional responsibility by, among other things:

- engaging in professional relationships that violated its professional and ethical rules of conduct;

- taking advantage of a relationship of trust and confidence and using its knowledge of Plaintiffs' finances to solicit Plaintiffs for the Leveraged Option Strategy;

- taking advantage of a relationship of trust and confidence in recommending the Leveraged Option Strategy;

- promoting, implementing, advising, recommending and selling an illegal, improper and invalid tax shelter that is disallowed and/or prohibited by the IRS;

- charging and collecting unreasonable, excessive and unethical fees;

- failing to disclose the actual roles of each Defendant in the Leveraged Option Strategy transaction;

- failing to disclose that Defendants were splitting and/or sharing fees;

- advising Plaintiffs that their tax returns, which utilized the losses generated by the Leveraged Option Strategy, were prepared in accordance with professional standards and pursuant to IRS guidelines and established legal authorities;

- failing to fully and properly inform and advise Plaintiffs of IRS Notice 2000-44 and its implications on the Leveraged Option Strategy;

- failing to advise, recommend and instruct Plaintiffs to amend their tax returns in light of IRS Notice 2000-44 or otherwise;

- failing to comply with its ethical obligations to Plaintiffs;

- violating its professional rules of conduct; and

- providing erroneous tax advice.

88.     But for Andersen's failure meet the applicable standard of care and to abide by the applicable provisions of its code of professional responsibility, Plaintiffs would never have hired Andersen for advice on the Leveraged Option Strategy, engaged in the Leveraged Option Strategy transactions, purchased unnecessary investments to effectuate the Leveraged Option Strategy transaction, filed federal and state tax returns that reflected deductions for losses resulting from the Leveraged Option Strategy transactions, failed to file amended tax returns, failed to enroll in the Amnesty Program, and failed to avail themselves of other legitimate tax savings opportunities.

89.     As a direct and proximate cause of Andersen's professional malpractice, Plaintiffs paid millions of dollars in fees to Defendants, taxes, interest, penalties, the purchase price of the worthless warrants to purchase stock, and additional professional fees to rectifying the wrongs perpetrated against them.

90.     By reason of such acts and conduct, Plaintiffs are entitled to recover all actual damages sustained as a result of Andersen's professional malpractice as alleged, to be proven

at trial, plus punitive damages in accordance with the evidence, interest, costs and reasonable attorneys fees.

### COUNT FIVE – BREACH OF FIDUCIARY DUTY (AGAINST ANDERSEN, BEER, BRICOLAGE, BRICKER, THE CURTIS FIRM AND VEERA)

91. Plaintiffs incorporate by reference the foregoing paragraphs of the Complaint as if fully set forth herein and further allege as follows.

92. Andersen, Beer, Bricolage, Bricker, the Curtis Firm and Veera, as Plaintiffs' tax advisors, accountants, investment advisors and attorneys, were Plaintiffs' fiduciaries and thus owed them the duties of honesty, loyalty, care and compliance with the applicable codes of professional responsibility.

93. Andersen, Beer, Bricolage, Bricker, the Curtis Firm and Veera breached their fiduciary duties to Plaintiffs by advising them to engage in the Leveraged Option Strategy transactions, to purchase worthless warrants to purchase stock, and to sign and file the tax returns in reliance on the their advice, representations, recommendations, instructions and opinions, which they knew or should have known to be improper and illegal, all for the purpose of generating fees and income.

94. As a result of Andersen, Beer, Bricolage, Bricker, the Curtis Firm and Veera's conduct, Plaintiffs have suffered injury in the nature of fees paid to Andersen, Bricolage and the Curtis Firm, taxes, interest, penalties, the purchase price of the worthless warrants to purchase stock, and additional professional fees to rectifying the wrongs perpetrated against them.

95. By reason of such acts and conduct, Plaintiffs are entitled to recover all actual damages sustained as a result of Andersen, Beer, Bricolage, Bricker, the Curtis Firm and Veera's acts as alleged, to be proven at trial, plus punitive damages in accordance with the evidence, interest, costs and reasonable attorneys fees.

## COUNT SIX – NEGLIGENCE
## (AGAINST ANDERSEN, BRICOLAGE AND THE CURTIS FIRM)

96.     Plaintiffs incorporate by reference the foregoing paragraphs of the Complaint as if fully set forth herein and further allege as follows.

97.     Andersen, Bricolage and the Curtis Firm directly or indirectly, negligently developed, structured, marketed, promoted and/or executed the Leveraged Option Strategy and purchase of stock warrants, when they knew, or in the exercise of ordinary care, should have known that the Leveraged Option Strategy would not be deemed, and the stock warrants would become worthless.

98.     At all times material hereto, Andersen, Bricolage and the Curtis Firm had a duty to Plaintiffs to exercise reasonable care in advising Plaintiffs regarding potential tax saving strategies and investments.

99.     Andersen, Bricolage and the Curtis Firm breached their duties and were negligent in their actions, misrepresentations, and omissions toward Plaintiffs in that they

- advised and recommended that Plaintiffs engage in the Leveraged Option Strategy;

- advised Plaintiffs that the Curtis Firm's opinion letter was an "independent" legal opinion from an "independent" law firm;

- failed to advise Plaintiff that, as a co-promoter of the Leveraged Option Strategy, the IRS was likely to deem the Curtis Firm non-independent, thereby precluding Plaintiffs from relying upon it for independent tax advice;

- failed to advise Plaintiffs that the Curtis Firm's opinion letter was not an independent legal opinion from an independent law firm;

- advised Plaintiffs that they could rely upon the Curtis Firm's opinion letter to satisfy the IRS as to the propriety of the Leveraged Option Strategy if audited;

- failed to advise Plaintiffs that the Curtis Firm had already prepared a canned, deceptive prefabricated form that was utilized, with minor changes based on the particular client, for each and every Leveraged Option Strategy transaction sold;

- advised Plaintiffs that the losses created by the Leveraged Option Strategy were legitimate, proper and in accordance with all applicable tax laws, rules and regulations;

- failed to disclose to Plaintiffs that if they filed tax returns claiming losses based on the Leveraged Option Strategy they would be liable for penalties and interest;

- failed to adequately discuss, analyze and advise Plaintiffs regarding the effects of IRS Notice 1999-59 on the Leveraged Option Strategy;

- advised Plaintiffs that their tax returns, which utilized the losses generated by the Leveraged Option Strategy, were prepared in accordance with professional standards and pursuant to IRS guidelines and established legal authorities;

- failed to fully and properly inform and advise Plaintiffs of IRS Notice 2000-44 and its implications on the Leveraged Option Strategy;

- failed to revise, alter, amend or modify the advice, recommendations, instructions representations, and opinions made to Plaintiffs, regarding the propriety of the Leveraged Option Strategy in light of IRS Notice 2000-44;

- failed to advise, recommend and instruct Plaintiffs to amend their tax returns in light of IRS Notice 2000-44 or otherwise;

- failed to recommend and advise Plaintiffs to enroll in the Amnesty Program in order to prevent penalties and interest; and

- provided erroneous legal and tax advice and opinions.

100.    Andersen, Bricolage and the Curtis Firm knew or should have known that the IRS would assert that the purported losses arising from the Leveraged Option Strategy were improper and not allowable for tax purposes, and that the warrants to purchase stock would become worthless.  Nevertheless, these Defendants actively and aggressively developed, structured, marketed, promoted and/or executed the Leveraged Option Strategy and the sale of stock warrants.

101.    As a direct and proximate cause of Andersen, Bricolage and the Curtis Firm's negligence, Plaintiffs have suffered injury in the nature of fees paid to Andersen, Bricolage and the Curtis Firm, interest, penalties, the purchase price of the worthless warrants to purchase stock, and additional professional fees to rectifying the wrongs perpetrated against them.

102.    By reason of such acts and conduct, Plaintiffs are entitled to recover all actual damages sustained as a result of Andersen, Bricolage and the Curtis Firm's negligence as alleged, to be proven at trial, plus punitive damages in accordance with the evidence, interest, costs and reasonable attorneys fees.

## V.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs demand judgment against Defendants as follows:

A.      as to their First Count (Fraud), a judgment in their favor against each Defendant, jointly and severally, actual damages in an amount to be proven at trial, plus punitive damages in accordance with the evidence, attorneys' fees, interests and costs;

B.      as to their Second Count (Civil Conspiracy), a judgment in their favor against each Defendant, jointly and severally, actual damages in an amount to be proven at trial, plus punitive damages in accordance with the evidence, attorneys' fees, interests and costs;

28

C.      as to their Third Count (Professional Malpractice), a judgment in their favor against the Curtis Firm, actual damages in an amount to be proven at trial, plus punitive damages in accordance with the evidence, attorneys' fees, interests and costs;

D.      as to their Fourth Count (Professional Malpractice), a judgment in their favor against Andersen, actual damages in an amount to be proven at trial, plus punitive damages in accordance with the evidence, attorneys' fees, interests and costs;

E.      as to their Fifth Count (Breach of Fiduciary Duty), a judgment in their favor against each Defendant, jointly and severally, actual damages in an amount to be proven at trial, plus punitive damages in accordance with the evidence, attorneys' fees, interests and costs;

F.      as to their Sixth Count (Negligence), a judgment in their favor against each Defendant, jointly and severally, actual damages in an amount to be proven at trial, plus punitive damages in accordance with the evidence, attorneys' fees, interests and costs; and

G.      against each Defendant, actual, punitive, enhanced and exemplary damages, attorneys' fees, costs, interest and such other and further relief as the Court may deem just and proper.

March 25, 2005

Respectfully submitted,

WAITE, SCHNEIDER, BAYLESS
& CHESLEY CO., L.P.A.

Stanley M. Chesley (0000852)

James R. Cummins (0000861)
Jean M. Geoppinger (0046881)
1513 Fourth & Vine Tower
One West Fourth Street
Cincinnati, Ohio 45202
Telephone: (513) 621-0267
Facsimile: (513) 621-0262

*Counsel for Plaintiffs*

30